**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

OFFICE OF THE COMMISSIONER OF BASEBALL, ANGELS BASEBALL LP, ATHLETICS INVESTMENT GROUP LLC, ATLANTA NATIONAL LEAGUE BASEBALL CLUB, LLC, AZPB LIMITED PARTNERSHIP, BALTIMORE ORIOLES LIMITED PARTNERSHIP, THE BASEBALL CLUB OF SEATTLE, LLLP, BOSTON RED SOX BASEBALL CLUB LIMITED PARTNERSHIP, CHICAGO CUBS BASEBALL CLUB, LLC, CHICAGO WHITE SOX, LTD., THE CINCINNATI REDS LLC, CLEVELAND GUARDIANS BASEBALL COMPANY, LLC, COLORADO ROCKIES BASEBALL CLUB, LLC, DETROIT TIGERS, INC., HOUSTON ASTROS, LLC, KANSAS CITY ROYALS BASEBALL CLUB, LLC, LOS ANGELES DODGERS LLC, MARLINS TEAMCO LLC, MILWAUKEE BREWERS BASEBALL CLUB, LIMITED PARTNERSHIP, MINNESOTA TWINS, LLC, NEW YORK YANKEES PARTNERSHIP, PADRES L.P., THE PHILLIES, PITTSBURGH ASSOCIATES, RANGERS BASEBALL, LLC, RAYS BASEBALL CLUB, LLC, ROGERS BLUE JAYS BASEBALL PARTNERSHIP, SAN FRANCISCO GIANTS BASEBALL CLUB LLC, ST. LOUIS CARDINALS, LLC, STERLING METS, L.P., WASHINGTON NATIONALS BASEBALL CLUB, LLC,

Plaintiffs,

v.

MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION, CHRIS BASSITT, JAKE CRONENWORTH, PETE FAIRBANKS, CEDRIC MULLINS II, MARCUS SEMIEN, PAUL SKENES, TARIK SKUBAL, BRENT SUTER, and all those similarly situated,

Defendants.

Case No. 26-cv-10380

**CLASS ACTION COMPLAINT FOR DECLARATORY RELIEF**

Plaintiffs, Office of the Commissioner of Baseball and its member Clubs (collectively "MLB" or the "League"), bring this Complaint against defendants, the Major League Baseball Players Association (the "Union" or the "MLBPA"), the individually named members of the Union's Major League Executive Subcommittee, and the defendant class (referred to herein with the individual defendants as the "Players"), and allege as follows:

## I. NATURE OF THE ACTION

1. MLB brings this action to keep the dispute over the next collective bargaining agreement ("CBA") at the bargaining table, where federal law says it belongs.

2. The long-term health of professional baseball depends on competitive balance, on keeping smaller-market Clubs viable, and on better pay for all Players, not just a handful of superstars. Other leading professional sports leagues have long pursued and obtained those objectives with revenue-sharing compensation systems, implemented with salary caps and floors. MLB has proposed to follow suit. In the current talks with the Players over a new CBA, MLB has been flexible in its approach to such a system. MLB has demonstrated that it is willing to negotiate over how to define the revenue that would be shared, the process that would be used to ensure that Players and Clubs receive a fair share of that revenue, as well as how and when this system would be implemented. From the start, though, the MLBPA has categorically refused to consider any proposal that includes a salary cap and floor. The Union has maintained its absolutist position and frustrated the bargaining process to date, even as the December 1, 2026, expiration of the current CBA draws near.

3. Federal labor law provides the collaborative framework for resolving labor disputes like this one. For decades, the League and the Players have negotiated within this framework to resolve their labor differences. The labor process provides each side with legal tools to push negotiations towards resolution: A union may strike and an employer may lock out its employees. The Supreme Court has long recognized that, just like strikes, lockouts are a permissible means under the labor laws to encourage compromise and, ultimately, agreement

between bargaining parties. *See Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 310–11, 318 (1965). Given the MLBPA's refusal to date to meaningfully discuss the League's proposals, MLB expects to exercise its right to implement a lockout (the "Lockout") upon expiration of the CBA at 11:59 p.m. ET on December 1, 2026, in support of its lawful bargaining position.

4. The Lockout will be consistent with labor and antitrust laws. The Clubs and Players have long negotiated the terms of their labor relations collectively through MLB and the MLBPA, respectively, without fear of antitrust liability under well-established exemptions. In multiemployer bargaining, a lockout is "unobjectionable as a matter of labor law and policy" and shielded from antitrust scrutiny by the nonstatutory labor exemption. *Brown v. Pro Football, Inc.*, 518 U.S. 231, 238 (1996).

5. A federal court may not enjoin the Lockout. The Norris-LaGuardia Act strips federal courts of jurisdiction to issue injunctions in any case involving or growing out of any labor dispute. *See Brady v. Nat'l Football League*, 644 F.3d 661, 670–71 (8th Cir. 2011). Courts have interpreted the Norris-LaGuardia Act "broadly as a statement of congressional policy that the courts must not use the antitrust laws as a vehicle to interfere in labor disputes." *H.A. Artists & Assocs., Inc. v. Actors' Equity Ass'n*, 451 U.S. 704, 714 (1981); *accord, e.g.*, *Brady*, 644 F.3d at 670, 676.

6. Nevertheless, based on the Union's conduct since negotiations began six months ago, MLB has a reasonable and imminent fear that the Union will attempt to use the threat of antitrust liability to derail the collective bargaining process altogether in favor of antitrust litigation. MLB believes that the Union is planning to follow the playbook its new leadership and advisors have executed against other major professional sports leagues. The MLBPA will purport to "disclaim" its status as the Players' bargaining representative and then argue that this unilateral action suddenly exposes MLB to antitrust liability for the Lockout.

7. The Union's disclaimer will not represent a genuine abandonment of collective representation, let alone a good-faith decision to permanently cede its role as the Players' representative. The lawyers and officials leading the Union have no real intention of abandoning

their role leading the Players' negotiating efforts. Instead, those lawyers and officials will use the threat of antitrust injunctions and treble damages to try to coerce MLB into caving to their bargaining demands. If they succeed in their gambit, they will then spontaneously resurrect the MLBPA and enter into a new CBA.

8. This is not how lawful labor negotiations are supposed to work. One side may not unilaterally strip the other of the antitrust immunity on which multiemployer bargaining depends by purporting to disclaim its longstanding status as a union to exert additional leverage and then miraculously reclaim its role as bargaining representative once it has secured concessions. The Union's anticipated disclaimer could not give rise to antitrust liability, even if it were not an obvious sham, as both the nonstatutory labor exemption and the Norris-LaGuardia Act would still apply. Nonetheless, the threat of injunctions and potential treble damages has real chilling effects that would distort the parties' ongoing bargaining. MLB accordingly brings this declaratory relief action to confirm that the Union and the Players must resolve their labor disputes through the collaborative framework established by federal labor law, not through baseless threats of antitrust liability.

9. To that end, MLB seeks three declarations. *First,* MLB requests a declaration that the Lockout is fully consistent with antitrust laws and protected by the nonstatutory labor exemption. That will remain true even after the MLBPA purports to disclaim its status as the Players' bargaining representative in violation of the National Labor Relations Act ("NLRA"). The disclaimer would not have the force of law unless and until the National Labor Relations Board ("NLRB" or the "Board"), in an exercise of its primary jurisdiction over such disputes, deemed it valid, rather than a sham deployed to evade the labor laws. Regardless of whether the MLBPA's anticipated disclaimer is a sham, the disclaimer would not extinguish the exemption, because the Lockout would not be "sufficiently distant in time and in circumstances from the collective-bargaining process" to remove it from labor-law protection. *Brown*, 518 U.S. at 250.

10. *Second,* MLB requests a declaration that, even if the Lockout were not exempt from antitrust scrutiny, it would be lawful because it is not an unreasonable restraint on trade.

The Lockout is a reasonable, temporary measure designed to encourage the parties to secure a new CBA and is ancillary to the lawful purposes of MLB's joint venture. The Lockout's procompetitive justifications plainly outweigh any anticompetitive effects.

11. *Third,* MLB requests a declaration that the federal courts lack jurisdiction to enjoin or restrain the Lockout under the Norris-LaGuardia Act, 29 U.S.C. §§ 101, 104, and 107, as well as under Section 20 of the Clayton Act, 29 U.S.C. § 52. Those laws strip federal courts of jurisdiction to issue any injunction "in any case involving or growing out of any labor dispute to prohibit any person . . . [from] [c]easing . . . to remain in any relation of employment." 29 U.S.C. § 104(a); *see also* 29 U.S.C. § 52 (prohibiting a court from issuing an injunction "prohibit[ing] any person . . . from terminating any relation of employment"). Those laws were designed to "tak[e] the federal courts out of the labor injunction business," and to thwart exactly the kind of unlawful weaponization of litigation that MLB anticipates the Union will attempt here. *Marine Cooks & Stewards, AFL v. Panama S. S. Co.*, 362 U.S. 365, 369 (1960).

12. The uncertainty created by the Union has already substantially disrupted the parties' bargaining process and, if not put to rest, threatens to disrupt the upcoming baseball season. Resolution of these issues now will allow the parties to settle their disputes where they belong. The path to a full 2027 baseball season is at the bargaining table, not through antitrust litigation.

## II. PARTIES

13. Plaintiff Office of the Commissioner of Baseball, otherwise known as Major League Baseball, is the world's premier professional baseball league. It is an unincorporated association comprised of 30 member Clubs. It is generally responsible for managing certain elements of the business that have league-wide scope, such as labor relations, game scheduling, and national broadcasting rights. Major League Baseball maintains its headquarters at 1271 Avenue of the Americas, New York, New York, 10020.

14. Major League Baseball's member Clubs are owned and operated by the following plaintiff-entities:

i) The Arizona Diamondbacks are owned and operated by AZPB Limited Partnership, a Delaware limited partnership. The Arizona Diamondbacks are located in Phoenix, Arizona.

ii) The Athletics are owned and operated by Athletics Investment Group LLC, a California limited liability company. The Athletics are located in West Sacramento, California.

iii) The Atlanta Braves are owned and operated by Atlanta National League Baseball Club, LLC, a Georgia limited liability company. The Atlanta Braves are located in Cobb County near Atlanta, Georgia.

iv) The Baltimore Orioles are owned and operated by Baltimore Orioles Limited Partnership, a Maryland limited partnership. The Baltimore Orioles are located in Baltimore, Maryland.

v) The Boston Red Sox are owned and operated by Boston Red Sox Baseball Club Limited Partnership, a Massachusetts limited partnership. The Boston Red Sox are located in Boston, Massachusetts.

vi) The Chicago Cubs are owned and operated by Chicago Cubs Baseball Club, LLC, a Delaware limited liability company. The Chicago Cubs are located in Chicago, Illinois.

vii) The Chicago White Sox are owned and operated by Chicago White Sox, Ltd., an Illinois limited partnership. The Chicago White Sox are located in Chicago, Illinois.

viii) The Cincinnati Reds are owned and operated by The Cincinnati Reds LLC, a Delaware limited liability company. The Cincinnati Reds are located in Cincinnati, Ohio.

ix) The Cleveland Guardians are owned and operated by Cleveland Guardians Baseball Company, LLC, an Ohio limited liability company. The Cleveland Guardians are located in Cleveland, Ohio.

x) The Colorado Rockies are owned and operated by Colorado Rockies Baseball Club, LLC, a Delaware limited liability company. The Colorado Rockies are located in Denver, Colorado.

xi) The Detroit Tigers are owned and operated by Detroit Tigers, Inc., a Michigan corporation. The Detroit Tigers are located in Detroit, Michigan.

xii) The Houston Astros are owned and operated by Houston Astros, LLC, a Texas limited liability company. The Houston Astros are located in Houston, Texas.

xiii) The Kansas City Royals are owned and operated by Kansas City Royals Baseball Club, LLC, a Delaware limited liability company. The Kansas City Royals are located in Kansas City, Missouri.

xiv) The Los Angeles Angels are owned and operated by Angels Baseball LP, a California limited partnership. The Los Angeles Angels are located in Anaheim, California.

xv) The Los Angeles Dodgers are owned and operated by Los Angeles Dodgers LLC, a Delaware limited liability company. The Los Angeles Dodgers are located in Los Angeles, California.

xvi) The Miami Marlins are owned and operated by Marlins Teamco LLC, a Delaware limited liability company. The Miami Marlins are located in Miami, Florida.

xvii) The Milwaukee Brewers are owned and operated by Milwaukee Brewers Baseball Club, Limited Partnership, a Wisconsin limited partnership. The Milwaukee Brewers are located in Milwaukee, Wisconsin.

xviii) The Minnesota Twins are owned and operated by Minnesota Twins, LLC, a Delaware limited liability company. The Minnesota Twins are located in Minneapolis, Minnesota.

xix) The New York Mets are owned and operated by Sterling Mets, L.P., a Delaware limited partnership. The New York Mets are located in Flushing, New York.

xx) The New York Yankees are owned and operated by New York Yankees Partnership, an Ohio limited partnership. The New York Yankees are located in the Bronx, New York.

xxi) The Philadelphia Phillies are owned and operated by The Phillies, a Pennsylvania limited partnership. The Philadelphia Phillies are located in Philadelphia, Pennsylvania.

xxii) The Pittsburgh Pirates are owned and operated by Pittsburgh Associates, a limited partnership under the laws of the Commonwealth of Pennsylvania. The Pittsburgh Pirates are located in Pittsburgh, Pennsylvania.

xxiii) The San Diego Padres are owned and operated by Padres L.P., a Delaware limited partnership. The San Diego Padres are located in San Diego, California.

xxiv) The San Francisco Giants are owned and operated by San Francisco Giants Baseball Club LLC, a Delaware limited liability company. The San Francisco Giants are located in San Francisco, California.

xxv) The Seattle Mariners are owned and operated by The Baseball Club of Seattle, LLLP, a Washington limited liability limited partnership. The Seattle Mariners are located in Seattle, Washington.

xxvi) The St. Louis Cardinals are owned and operated by St. Louis Cardinals, LLC, a Missouri limited liability company. The St. Louis Cardinals are located in St. Louis, Missouri.

xxvii) The Tampa Bay Rays are owned and operated by Rays Baseball Club, LLC, a Florida limited liability company. The Tampa Bay Rays are located in St. Petersburg, Florida.

xxviii) The Texas Rangers are owned and operated by Rangers Baseball, LLC, a Delaware limited liability company. The Texas Rangers are located in Arlington, Texas.

xxix) The Toronto Blue Jays are owned and operated by Rogers Blue Jays Baseball Partnership, an Ontario general partnership. The Toronto Blue Jays are located in Toronto, Ontario, Canada.

xxx) The Washington Nationals are owned and operated by Washington Nationals Baseball Club, LLC, a District of Columbia limited liability company. The Washington Nationals are located in Washington, District of Columbia.

15. Defendant Major League Baseball Players Association, an unincorporated association, is a labor organization that has represented Major League Players since 1966. MLB recognizes the Union as the sole and exclusive collective bargaining representative of all Major League Players under the CBA.[1] The Union represents more than 1,500 Major League Players and more than 6,000 Minor League Players, who are covered by a separate CBA that expires in 2027.[2] The Union regularly represents employees employed in this district for purposes of collective bargaining and maintains its headquarters at 1325 Avenue of the Americas, New York, New York, 10019.

16. MLB names as individual defendants and class representatives the following Players who serve as members of the MLBPA's Executive Subcommittee:

i) Chris Bassitt is a professional baseball player who most recently played with the Baltimore Orioles. Bassitt is an Association Player Representative who serves on the Executive Subcommittee of the Union. He elected free agency on October 29, 2026.

ii) Jake Cronenworth is a professional baseball player with the San Diego Padres. Cronenworth is an Alternate Association Player Representative who serves on the Executive Subcommittee of the Union.

---

[1] 2022-2026 Major League Collective Bargaining Agreement, Art. II, accessible here: https://www.mlbplayers.com/resources/major-league-cba ("2022-2026 CBA").

[2] Major League Baseball Players Ass'n, Form LM-2 Labor Organization Annual Report for 2025, Schedule 13, at 35 (March 31, 2026).

iii) Pete Fairbanks is a professional baseball player who most recently played with the Miami Marlins. Fairbanks is a Pension Committee Representative who also serves on the Executive Subcommittee of the Union. He elected free agency on October 29, 2026.

iv) Cedric Mullins II is a professional baseball player who most recently played with the Tampa Bay Rays. Mullins is an Alternate Pension Committee Representative who also serves on the Executive Subcommittee of the Union. He became a free agent on October 30, 2026.

v) Marcus Semien is a professional baseball player with the New York Mets. Semien is an Association Player Representative who serves on the Executive Subcommittee of the Union.

vi) Paul Skenes is a professional baseball player with the Pittsburgh Pirates. Skenes is an Alternate Association Player Representative who serves on the Executive Subcommittee of the Union.

vii) Tarik Skubal is a professional baseball player who previously played with the Los Angeles Dodgers. He reportedly recently agreed to a new contract to play for the New York Mets. Skubal is an Alternate Pension Committee Representative who also serves on the Executive Subcommittee of the Union.

viii) Brent Suter is a professional baseball player who previously played with the Atlanta Braves. He recently agreed to a new contract to play for the New York Yankees. Suter is a Pension Committee Representative who also serves on the Executive Subcommittee of the Union.

## III. JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises under the Sherman Act, 15 U.S.C. § 1 *et seq.*, and the Clayton Act, 29 U.S.C. § 52 *et seq.*, and presents substantial questions of federal law. This action also seeks declaratory relief under 28 U.S.C. §§ 2201 and 2202 and raises issues governed by

federal labor law, including the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq*., and the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* The Court has supplemental jurisdiction over any related claims pursuant to 28 U.S.C. § 1367.

18. Venue is proper in this district pursuant to 28 U.S.C. § 1391. As described above, MLB and the Union each maintain their principal places of business in this district. Furthermore, a substantial part of the events giving rise to the claims occurred in this district. To date, all of the parties' collective bargaining sessions have occurred in this district—at either the offices of the Union or MLB—including the first collective bargaining negotiation on May 12, 2026, the exchanges of opening proposals on May 27 and 28, and additional sessions and proposals on June 18 and 25; July 1, 21, and 28; August 10, 18, and 27; September 10 and 25; October 2, 8, 22, and 29; and November 3, 4, 19, 20, 23, and 24. Numerous decisions, communications, and strategic discussions relevant to the claims asserted herein also occurred within this district.

19. This Court has personal jurisdiction over the Union because it is headquartered in this district, has continuously and purposefully conducted its collective bargaining activities from this district, and has directed the conduct giving rise to this action from its principal place of business in New York. The Union has attended bargaining sessions for a successor CBA, exchanged bargaining proposals with MLB, developed its bargaining strategy, and communicated with MLB, in substantial part, in this district. Moreover, the Union has pursued litigation on behalf of itself and Players in the past in this district.[3] The Union is therefore subject to the general and specific personal jurisdiction of this Court.

20. This Court likewise has personal jurisdiction over the individually named Player Defendants and the proposed defendant class. On information and belief, each named Player

---

[3] *See, e.g., Major League Baseball Players Ass'n v. Oneup Games LLC*, No. 1:16-cv-04084-PKC (S.D.N.Y. 2016) (filed suit to protect its trademarks); *Major League Baseball Players Ass'n v. Dad's Kid Corp.*, 806 F. Supp. 458 (S.D.N.Y. 1992) (filed suit on behalf of players, alleging misappropriation of publicity rights belonging to major league players); *see also, e.g., MLB Players Inc. v. Underdog Sports, Inc.*, No. 24-cv-07958-RA (S.D.N.Y. 2024) (filed suit in New York state court on behalf of players, alleging misappropriation of players' names, images, and likenesses, which was removed to S.D.N.Y.).

Defendant voluntarily serves as an Executive Subcommittee member for the Union, and, through that position, has purposefully participated in and directed the collective bargaining activities, negotiations, strategic decision-making, and other conduct challenged in this action. Those activities include participating in bargaining sessions in this district, authorizing and coordinating the Union's bargaining strategy in this district, and acting in concert with the Union from its headquarters in this district.

## IV. FACTUAL ALLEGATIONS

### A. MLB and the Union Have Long Used Traditional Labor Tools like Strikes, Lockouts, and NLRB Adjudication to Successfully Resolve Labor Disputes.

21. The collective bargaining relationship between MLB and the Union spans more than half a century and has been governed throughout by the federal labor-law framework established by the NLRA. Since 1968, the parties have negotiated and executed more than a dozen successive CBAs, with disputes over terms and conditions of employment addressed through the processes prescribed by federal labor law.

22. This track record would not have been possible but for the parties' mutual commitment to resolving their disputes exclusively and in good faith through the traditional collective bargaining process, including proceedings before the NLRB. In past instances where the parties have been unable to reach agreement either at or after expiration of the CBA, they have relied on the bargaining tools afforded to them by federal labor law—strikes and lockouts—to support their bargaining positions, while directing disputes regarding bargaining obligations, alleged bad-faith conduct, and related issues to the primary jurisdiction of the NLRB.

23. These bargaining tools have been used by both sides. In 1972, the players engaged in their first-ever strike. In the decades that followed, the players struck four more times, including in 1980, in 1981, and again in 1985. In 1994–95, the players engaged in a strike that resulted in the longest work stoppage in baseball history—canceling more than 900 games across two seasons and the entire 1994 post-season, including the World Series.

24. MLB, for its part, has initiated four lockouts, in 1973, 1976, 1990, and most recently in 2021. Unlike with the players' strikes, no regular-season games have ultimately been lost as a result of an MLB lockout. As in prior bargaining cycles, the most recent dispute in 2021 was addressed within the statutory framework established by federal labor law. After the parties were unable to reach agreement before the expiration of the CBA, MLB exercised its labor-law rights and implemented a lockout in support of its bargaining position on December 2, 2021. The parties continued to negotiate during the lockout, and on March 10, 2022, after approximately 99 days, they reached agreement on a successor CBA.

25. For almost six decades, both sides have used the lawful labor tools at their disposal to advance their positions in negotiations.

**B. The Union Has Not Bargained in Good Faith for a New CBA.**

26. The most recent collective bargaining agreement, which governs the collective terms and conditions of employment for all Players, covers the period from March 10, 2022, through December 1, 2026. The agreement recognizes the Union as "the sole and exclusive collective bargaining agent" for all Major League Players and for individuals who "may become Major League Players during the term of th[e] [a]greement, with regard to all terms and conditions of employment[.]"[4]

27. From the beginning of bargaining discussions this year, the Union made clear that it intended to stonewall. Indeed, as early as February 2026, before MLB had presented its initial salary cap and floor proposal, Bruce Meyer—the MLBPA's Interim Executive Director and lead negotiator—declared that the Union's longstanding opposition to a salary cap and floor "is not going to change."[5] He emphasized, "This is something [the Club owners have] always wanted.

---

[4] *See supra* n.1 (2022-2026 CBA), Art. II.

[5] Ben Lindbergh, *How Worried Should You Be About the 2027 MLB Season? A Labor-Battle FAQ*, The Ringer (Mar. 23, 2026), https://www.theringer.com/2026/03/23/mlb/mlb-mlbpa-labor-battle-faq-lockout-work-stoppage-2027-season.

It's not new . . . . Our union historically has been against it because we believe it's quite simply not good for players. That position is not going to change."[6]

28. When MLB presented its initial economic proposals for a new CBA in May, the Union categorically rejected MLB's proposal for baseball revenue-sharing with a salary cap and floor structure. At the time, Meyer stated publicly that "generations of players have fought against" a salary cap system, and "[t]he last time the owners made such an explicit push for a cap—over 30 years ago—it led to the longest work stoppage in MLB history," referring to the players' strike in 1994 and 1995, which forced the cancellation of the World Series.[7] As negotiations continued over the summer and into the fall, the Union continued to refuse to bargain in good faith. Although the parties met regularly, Meyer said they remained "worlds apart because the league has proposed a salary cap system."[8] He noted, "[t]his would be a tough negotiation even without their demand for the nuclear bomb of the salary cap."[9]

29. Over the past six months, MLB has repeatedly sought to engage in substantive, good-faith negotiations with the Union to reach a successor agreement before the current CBA expires on December 1. Despite the MLBPA's refusals to negotiate on the salary cap and floor structure, MLB has devoted substantial time and resources to the bargaining process, made numerous proposals, and remained prepared to negotiate over all mandatory subjects of bargaining. In negotiations, MLB has accepted, engaged with, and explored numerous discrete terms proposed by the MLBPA, while the Union has largely refused to substantively engage with

---

[6] *Id.*

[7] *Statement from Interim Executive Director Bruce Meyer*, MLBPlayers.com (May 28, 2026), https://www.mlbplayers.com/post/statement-from-interim-executive-director-bruce-meyer.

[8] Mike Mazzeo, *Meyer: Union, MLB 'worlds apart' on core economic issues of CBA*, Sports Business Journal (Sept. 16, 2026), https://www.sportsbusinessjournal.com/Articles/2026/09/16/meyer-union-mlb-worlds-apart-on-core-economic-issues-of-cba/.

[9] Ronald Blum, *Union head calls MLB's salary cap proposal 'nuclear bomb' ahead of World Series opener*, Associated Press (Oct. 23, 2026), https://apnews.com/article/mlb-lockout-world-series-44aa55eea468f74c803995bc53a5bfe5.

MLB's economic proposals at all. Instead, the MLBPA has continually rejected MLB's proposals as "totally unserious."[10]

30. The MLBPA's refusal to seek meaningful compromise is apparent from its behavior at the bargaining table. Negotiations for a new CBA formally began on May 12, 2026.[11] Two weeks later, the MLBPA made its opening package of proposals to the League, including what it considered "a comprehensive set of economic proposals designed to advance the rights and benefits of players at all levels[.]"[12] But the MLBPA's proposals did not address and, in fact, would exacerbate "the competitive balance problems [that baseball] fans are telling [the League] [that it] must address."[13] As MLB has explained, the MLBPA's proposal "would reduce the amount of money transferred [from high-revenue Clubs] to lower-revenue Clubs, weaken the [current] Competitive Balance Tax, and [almost certainly] lead to even more payroll disparity than exists today."[14]

31. MLB put forth its opening proposals the next day with an emphasis on improving competitive balance for the fans and addressing revenue and pay disparities among the member Clubs.[15] MLB's opening proposals projected a 2027 salary cap of $245.3 million and a salary floor of $171.2 million for 2027. It also provided for sharing of baseball revenue between Players and Clubs with a 50/50 split.[16] Meyer publicly expressed disapproval of the proposals—

---

[10] Jerry Crasnick, *Players Underwhelmed by MLB's Latest Proposal*, MLBPlayers.com (June 25, 2026), https://www.mlbplayers.com/post/players-underwhelmed-by-mlb-s-latest-proposal.

[11] Dayn Perry, *MLB CBA negotiations timeline*, CBS Sports (2026), https://www.cbssports.com/mlb/news/mlb-cba-negotiations-timeline-2026/.

[12] *MLBPA Makes Opening Proposals to Benefit All Players and Build Upon Industry Momentum*, MLBPlayers.com (May 27, 2026), https://www.mlbplayers.com/post/mlbpa-makes-opening-proposals-to-benefit-all-players-and-build-upon-industry-momentum.

[13] Jorge Castillo, *MLBPA makes 1st proposal in collective bargaining negotiations*, ESPN (May 27, 2026), https://www.espn.com/mlb/story/_/id/48893571/mlbpa-makes-1st-proposal-collective-bargaining-negotiations.

[14] *Id.*

[15] Mark Feinsand, *MLB makes initial CBA proposal to address competitive balance*, MLB.com (May 28, 2026), https://www.mlb.com/news/mlb-makes-initial-economic-proposal-for-new-cba.

[16] *Id.*

and the MLBPA rejected them out of hand.[17] Meanwhile, MLB continued to push the Union to engage meaningfully in the collective bargaining process with MLB Commissioner Robert D. Manfred, Jr. responding, "[w]e made a proposal on one set of topics. . . . We're open to whatever ideas people have, but we need a realistic framework that addresses the fans' concerns about competitive balance."[18]

32. For MLB, competitive balance is a central issue of the negotiations because the growing gap in team payrolls makes it harder for all teams to have a fair chance to compete.[19] The public agrees. 79 percent of avid MLB fans and 69 percent of casual fans support a salary cap and floor system.[20] Indeed, similar revenue-sharing salary cap structures exist in most major North American professional sports leagues, including the NFL, NBA, and NHL. Meanwhile, for MLB, there is currently a $446 million gap in spending between the highest- and lowest-spending Clubs—the Los Angeles Dodgers and Miami Marlins, respectively.[21] A salary cap and floor would narrow this gap by shrinking current pay disparities, where top-spending teams spend more than five times as much as the lowest-spending teams. As part of its package of economic proposals, MLB has also offered the largest increase ever to minimum salaries and tied aggregate Player compensation growth to baseball revenue growth to ensure that salaries grow as MLB's revenues do.

33. In mid-June, MLB and the MLBPA met again to discuss proposals regarding the annual MLB draft of domestic amateur players and a new draft system for international amateur

---

[17] Dayn Perry, *MLB CBA negotiations timeline*, CBS Sports (2026), https://www.cbssports.com/mlb/news/mlb-cba-negotiations-timeline-2026/.

[18] *Id.*

[19] *Level the Playing Field*, MLB.com, https://www.mlb.com/level-the-playing-field.

[20] Nick Laughlin, *A MLB Salary Cap Is Widely Supported by Baseball Fans*, Morning Consult (Nov. 19, 2025), https://intel.morningconsult.com/mc-content/articles/mlb-salary-cap-november-2025-survey-data; *see also* Travis Sawchik, *Baseball's competitive balance issue, explained*, MLB.com (June 20, 2026), https://www.mlb.com/news/mlb-competitive-balance-issue-explained.

[21] Mark Feinsand, *MLB makes initial CBA proposal to address competitive balance*, MLB.com (May 28, 2026), https://www.mlb.com/news/mlb-makes-initial-economic-proposal-for-new-cba.

players.[22] Only hours after receiving those proposals, the MLBPA attacked them, publicly stating, "MLB made another set of proposals that are flat out bad for baseball . . . . [T]he league's proposals fall woefully short."[23]

34. MLB then met with the MLBPA again later in June and sought meaningful compromise.[24] In this session, MLB agreed, as part of a broader economic package, to accept the MLBPA's initial free agency proposal, which would create a shorter path to free agency for many Players. This would be the first reduction in the amount of Major League service time required before a player could become a free agent since the free agency system was introduced in 1976.[25] MLB also agreed to eliminate draft pick compensation penalties currently imposed on Clubs that sign certain qualified free agents, which the Union believes reduce the incentive for Clubs to sign certain free agents.[26]

35. Moreover, MLB proposed a historic increase to the minimum player salary—impacting over half of all Players—including a $1 million minimum for all Players with at least two years of Major League service.[27] These proposals were part of the broader economic package, which includes a salary cap and floor structure, an aggregate 50 percent share of baseball revenue, as well as centralized media revenue sharing.[28] In response, the MLBPA rebuked MLB, stating that Club owners' supposed "attempts to pit" Players against one another "failed in the past and will fail again now, because [Union] members remain unified."[29]

---

[22] Dayn Perry, *MLB CBA negotiations timeline*, CBS Sports (2026), https://www.cbssports.com/mlb/news/mlb-cba-negotiations-timeline-2026/.

[23] *Id.*

[24] @MLB Post, X (June 25, 2026), https://x.com/MLB/status/2070215382426620396.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] Dayn Perry, *MLB's new CBA proposal would restrict free-agency contracts, raise minimum wage, but only with a salary cap*, CBS Sports (June 25, 2026), https://www.cbssports.com/mlb/news/mlb-cba-proposal-free-agency-contract-minimum-wage-

36. In early July, the MLBPA proposed changes to roster and assignment rules.[30] Then, later in the month, the MLBPA rejected MLB's domestic draft proposals and put forth its own affirmative domestic draft proposal without providing a formal counterproposal during a negotiating session.[31] At the bargaining session on July 21, multiple active Major League Players voiced their objection to MLB's proposed change to draft eligibility. MLB heard those concerns and further compromised by withdrawing its proposals to eliminate high school and junior college eligibility on November 20.

37. In August, MLB proposed an additional series of changes to current roster and free agency rules aimed at "creating more stability in rosters, getting the best players to the Major Leagues more quickly, and accelerating the pace of the offseason[.]"[32] MLB explained that "[i]n our current economic system, these changes would be too harmful to competitive balance and would not be practical," but they could be unlocked in a cap and floor system.[33] The MLBPA again publicly criticized the package immediately, calling it "entirely unserious."[34] MLB is still awaiting a formal response to its August proposal.

38. In October, MLB presented proposals related to game scheduling and season structuring, addressing Players' previously expressed interest in more (and more consistent) off-days. MLB proposed, among other things, a 154-game regular season with a weekly off-day to benefit player health and recovery and to provide Players with more consistent days off,

---

salary-cap/.

[30] Dayn Perry, *MLB CBA negotiations timeline*, CBS Sports (2026), https://www.cbssports.com/mlb/news/mlb-cba-negotiations-timeline-2026/.

[31] @MLBPA Post, X (July 21, 2026), https://x.com/MLBPA/status/2079658199498539019; *see also MLBPA Makes Proposals to Protect and Improve Amateur Draft*, MLBPlayers.com (July 21, 2026), https://www.mlbplayers.com/press-releases/mlbpa-makes-proposals-to-protect-and-improve-amateur-draft.

[32] Mark Feinsand, *MLB's latest CBA proposal aims to create more roster stability*, MLB.com (Aug. 27, 2026), https://www.mlb.com/news/mlb-cba-proposal-roster-stability.

[33] *Id.*

[34] @MLBPA Post, X (Aug. 27, 2026), https://x.com/MLBPA/status/2093092894223569176.

beginning in 2029.[35] It also proposed a best-of-seven Division Series, beginning in 2029, which would allow for up to eight additional games across the four Division Series.[36] MLB would also add more off-days during the MLB postseason. Although MLB's proposal would reduce the number of regular season games for Players,[37] the MLBPA made clear that, while it would "respond at the bargaining table," it continued to oppose MLB's proposals that "are contingent on [P]layers' agreement to a salary cap[.]"[38] MLB is still awaiting a formal response to its October proposal.

39. In early November, MLB presented a revised transition proposal.[39] In the revised package, MLB proposed to delay implementation of its offer to share a defined percentage of revenue with Players, along with a salary cap and floor structure, until 2028, when MLB projects the salary floor would be $180.2 million and its salary cap would be $258.2 million. For 2027, MLB proposed to retain the current Competitive Balance Tax ("CBT") system and inter-Club revenue sharing plan—with no cap, no floor, no Players' share of the revenue, and no escrow. MLB also offered the option, upon ratification, to use the portion of the 2026 CBT proceeds otherwise earmarked for Players' individual retirement accounts to instead pay cash ratification bonuses to eligible Players. Finally, MLB also maintained its willingness to provide unprecedented minimum salary increases and earlier free agency, among other things, effective in 2027, notwithstanding the one-year delay in implementing the cap and floor structure.

---

[35] @MLB Post, X (Oct. 8, 2026), https://x.com/MLB/status/2108248649440375237.

[36] *Id.*

[37] Mike Axisa, *MLB proposes 154-game regular schedule, bulked-up playoff schedule with a twist in latest labor talks*, CBS Sports (Oct. 8, 2026), https://www.cbssports.com/mlb/news/mlb-proposes-154-game-regular-season-bulked-up-playoff-schedule/.

[38] *Statement from Major League Baseball Players Association*, MLBPlayers.com (Oct. 8, 2026), https://www.mlbplayers.com/post/statement-from-major-league-baseball-players-association.

[39] Mark Feinsand, *MLB increases cap and floor in latest proposal, sets 2028 target*, MLB.com (Nov. 3, 2026), https://www.mlb.com/news/mlb-increases-cap-and-floor-in-latest-proposal-sets-2028-target.

40. In late November, the MLBPA continued to publicly attack MLB without substantively engaging with MLB's salary cap and floor proposal. Two weeks prior to the expiration of the CBA, Meyer publicly stated that MLB's proposals are a clear example "of the [L]eague's lack of seriousness[.]"[40] The MLBPA finally provided its initial proposal on international amateur entry, rejecting in its entirety MLB's initial proposal on that topic from June.[41] On November 23, the MLBPA proposed pooling all local media revenue under its own inter-Club revenue sharing formula, which included penalties for Clubs that do not maintain a sufficient payroll, while maintaining its steadfast opposition to a salary cap and floor system and other components of MLB's initial revenue sharing proposal.[42]

41. The MLBPA continued to vehemently refuse to consider MLB's salary cap and floor system. For example, on November 23, MLB also proposed increasing the Major League minimum salary in its system, along with new, centrally funded signing bonuses for arbitration-eligible Players and veterans.[43] Among other things, MLB proposed that all Major League Players would receive a minimum salary of $1 million in 2027.[44] MLB's proposed increase of $220,000 over the 2026 minimum salary would be the largest year-over-year dollar increase ever to the minimum salary. Under MLB's proposal, eligible pre-arbitration Players who earned a full year of service and spent fewer than 94 days on the Injured List would receive an additional $100,000 service bonus (unless they are otherwise receiving an awards- or statistical-phase

---

[40] *Statement from Interim Executive Director Bruce Meyer*, MLBPlayers.com (Nov. 18, 2026), https://www.mlbplayers.com/post/statement-from-interim-executive-director-bruce-meyer-2.

[41] *See MLBPA Makes International Amateur Signing Proposal*, MLBPlayers.com (Nov. 20, 2026), https://www.mlbplayers.com/post/mlbpa-makes-international-amateur-signing-proposal.

[42] *Players Agree to MLB Proposal to Share All Media Revenue Equally Across Clubs, Addressing Concerns About Revenue Disparity and Blackouts*, MLBPlayers.com (Nov. 23, 2026), https://www.mlbplayers.com/post/players-agree-to-mlb-proposal-to-share-all-media-revenue-equally-across-clubs-addressing-concerns-a.

[43] Anthony Castrovince, *MLB's latest proposal to union includes jump in minimum salary, new player bonuses*, MLB.com (Nov. 23, 2026), https://www.mlb.com/news/mlb-cba-proposal-minimum-salary-increase.

[44] *Id.*

distribution for that season from the Pre-Arbitration Performance Bonus Program).[45] MLB noted that 57 percent of Players on Opening Day 40-man rosters in 2026 would have benefited from its new minimum.[46] But, once again, the Union refused to engage with MLB's proposals.[47]

42. Despite the many efforts by MLB to find common ground with the MLBPA, the Union has categorically refused to engage with MLB's salary cap and floor structure. And it has delayed providing, until the eleventh hour before CBA expiration, initial proposals on core issues for the MLBPA, such as the Major League Baseball Players Benefit Plan (proposal on November 19), which is a multibillion-dollar pension and benefit plan through which current and former Major League Players and their families receive retirement, healthcare, and life insurance benefits, and international amateur entry (proposal on November 20). In short, the Union has not engaged in good-faith bargaining over the central economic issues in these negotiations, even as the expiration of the current CBA is imminent.

43. Instead, the Union has demonstrated, time and again, that it is not focused on reaching a fair compromise through the collective bargaining process. While the Clubs have worked diligently to put forth timely, good-faith proposals on a wide range of issues, the Union has largely ignored and repeatedly publicly denounced several of them as "unserious."[48] Indeed, the Union's leadership has acknowledged that it does not intend to engage in meaningful bargaining until after the current CBA expires. For example, MLBPA Executive Subcommittee member Jake Cronenworth said, before negotiations began, that Players "have taken a pretty

---

[45] *Id.*

[46] *Id.*

[47] Alden Gonzalez, *MLB offers higher minimum salaries while union eyes local media revenue sharing*, ESPN (Nov. 23, 2026), https://www.espn.com/mlb/story/_/id/50576198/mlb-offers-higher-minimum-player-salaries-lockout-looms.

[48] Jerry Crasnick, *Players Underwhelmed by MLB's Latest Proposal*, MLBPlayers.com (June 25, 2026), https://www.mlbplayers.com/post/players-underwhelmed-by-mlb-s-latest-proposal; @MLBPA Post, X (Aug. 27, 2026), https://x.com/MLBPA/status/2093092894223569176; *see Statement from Interim Executive Director Bruce Meyer*, MLBPlayers.com (Nov. 18, 2026), https://www.mlbplayers.com/post/statement-from-interim-executive-director-bruce-meyer-2.

hard stance on [a salary cap]. Not just this year, but forever."[49] Paul Skenes, another MLBPA Executive Subcommittee member, said in June: "There's a line that we're not going to cross, and if we have to miss games, we'll miss games. . . . There's probably not a whole lot that's going to happen until the time comes where we have to miss games."[50] Meanwhile, in a recent bargaining session, another Executive Subcommittee member stated flatly that Players do not want to discuss the cap at all. And Garrett Stubbs, the MLBPA Club Representative for the Philadelphia Phillies, recently explained that he "couldn't care less about" the negotiations.[51] "They are worthless. . . . It is the biggest waste of time. . . . It's a charade," he added.[52] "Obviously a salary cap is a non-starter for us [as players]."[53]

44. Thus, given the Union's obstructionist refusal to bargain and the impending expiration of the CBA, MLB intends to implement a Lockout upon expiration in support of the Clubs' bargaining position. The Lockout would be a temporary measure to encourage compromise between the parties and expedite the process of reaching a successor CBA. Throughout the Lockout, MLB will continue to negotiate in good faith with the MLBPA.

**C. MLB's Intended Lockout Does Not Violate the Antitrust Laws.**

45. Federal labor law provides the framework for resolving labor disputes. And under federal labor law, a union can choose to strike, and the employer—or group of employers—can opt to lock out its employees. *Am. Ship Bldg.*, 380 U.S. at 310–11, 318 (recognizing the

---

[49] Barry M. Bloom, *Padres' Cronenworth, Pivetta on baseball labor fight: Salary cap is a nonstarter*, Times of San Diego (Feb. 28, 2026), https://timesofsandiego.com/sports/2026/02/28/padres-cronenworth-pivetta-baseball-salary-cap/.

[50] Colin Beazley, *Why Paul Skenes, at the center of MLB's labor battle, believes the players need to dig in*, Pittsburgh Post-Gazette (June 13, 2026), https://www.post-gazette.com/sports/pirates/2026/06/13/mlb-labor-payroll-skenes-nutting-cba-mlbpa-manfred/stories/202606130024/.

[51] @PhillySport (Philadelphia Inquirer Sports) Post, X (Nov. 5, 2026), https://x.com/phillysport/status/2118405311425892400?s=12.

[52] *Id.*

[53] Scott Lauber, *Garrett Stubbs on why a lockout will cost games, the salary cap debate, and more*, Philadelphia Inquirer (Nov. 2, 2026), www.inquirer.com/phillies/garrett-stubbs-lockout-mlb-labor-salary-cap-issues-20261102.html.

legitimacy of lockouts in bargaining); *Nat'l Basketball Ass'n v. Williams*, 45 F.3d 684, 691 (2d Cir. 1995) (noting it is "settled law" that employers may use "lock-outs[] in support of their demands" in labor negotiations).

46. Labor law permits and even encourages the use of multiemployer bargaining, even though the joint proposal and agreement of terms would implicate the antitrust laws in other contexts. And the labor laws do not deprive multiemployer groups of the bargaining tools routinely available to single employers. That includes the use of lockouts to advance labor negotiations in multiemployer negotiations. *Brown*, 518 U.S. at 240–42. Indeed, for more than sixty years, the Supreme Court has recognized that a lockout is a legitimate economic tool that an employer like MLB can use to advance its bargaining position. *See Am. Ship Bldg.*, 380 U.S. at 310–11, 318; *see also Williams*, 45 F.3d at 691.

47. Precisely because multiemployer lockouts are a legitimate bargaining tool under the labor laws, courts have long recognized that such lockouts do not violate the antitrust laws. Where conduct "is unobjectionable as a matter of labor law and policy," the nonstatutory labor exemption shields it from antitrust scrutiny. *Brown*, 518 U.S. at 238. A lockout that is lawfully imposed to apply economic pressure in support of collective bargaining demands therefore falls within the ambit of that exemption. Locked-out employees "must respond not with a lawsuit brought under the Sherman Act, but rather with the [tools] provided by the federal labor laws." *Brown v. Pro Football, Inc.*, 50 F.3d 1041, 1045 (D.C. Cir. 1995), *aff'd,* 518 U.S. 231 (1996).

48. That exemption applies with particular force in the context of multiemployer bargaining, which the Supreme Court has described as a "well-established, important, pervasive method of collective bargaining[.]" *Brown*, 518 U.S. at 240. In most professional sports leagues, multiemployer bargaining is not merely customary—it is a practical necessity. Indeed, MLB's collective decision-making produces substantial procompetitive benefits, including maintaining the competitive balance among Clubs, promoting the financial stability of the League, creating more equitable pay for Players, and enhancing the quality of the games offered to consumers. MLB's Lockout is therefore exempt from antitrust scrutiny under the nonstatutory labor

exemption and, even if the antitrust laws had some role to play here, would not violate those laws under the rule of reason.

49. The Lockout is also statutorily protected from judicial interference at the MLBPA's behest by the Norris-LaGuardia Act, which Congress enacted to "tak[e] the federal courts out of the labor injunction business[.]" *Marine Cooks*, 362 U.S. at 369. To that end, Section 1 of the Act embraces a general policy disfavoring injunctions in all cases "involving or growing out of a labor dispute[.]" 29 U.S.C. § 101. And Section 4 enumerates activities that courts may not enjoin under any circumstances. As relevant here, it provides: "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute . . . from doing . . . any of the following acts: (a) Ceasing or refusing to perform any work or to remain in any relation of employment." 29 U.S.C. § 104(a). The Act defines "labor dispute" broadly to include "any controversy concerning terms or conditions of employment[.]" 29 U.S.C. § 113(c). And it specifies that a case "involve[s]" or "grow[s] out of" a labor dispute when, *inter alia*, "the case involves persons who are engaged in the same industry" and the dispute is "between one or more employers or associations of employers and one or more employees or associations of employees." 29 U.S.C. § 113(a). By precluding either side in a labor dispute from obtaining a judicial injunction, the Norris-LaGuardia Act preserves the primacy of the labor laws and directs disputes to the NLRB. *See Marine Cooks*, 362 U.S. at 369; *Brady*, 644 F.3d at 669–70.

50. The Lockout will plainly "involve or grow out of a labor dispute." MLB intends to impose the Lockout upon expiration of the CBA because of a dispute with its Players over the terms and conditions of their employment. Defendants and the League are "engaged in the same industry," and the dispute is between "one or more employers" and "one or more employees." And by imposing the Lockout, MLB will be "ceas[ing] or refus[ing] to remain in [a] relation of employment." Thus, even if there were some question about the Lockout's legality, the Norris-LaGuardia Act would preclude the federal courts from enjoining it. As the Eighth Circuit held

with respect to the NFL's lockout, a lawsuit to enjoin a lockout "is a controversy concerning terms or conditions of employment" and falls comfortably within the Act's "expansive" terms. *Brady*, 644 F.3d at 670, 676.

**D. A Sham Disclaimer by the Union Would Not Change MLB's Right to Lock Out the Players Under Federal Labor Law.**

51. Though the antitrust laws do not deprive MLB of the tools that federal labor law provides, MLB nevertheless expects the Union and the Players to file a lawsuit claiming that the Lockout is an antitrust violation. Following in the footsteps of other players' unions that have sought to upend good-faith negotiations when they could not get what they wanted at the bargaining table, MLB anticipates the Union will "disclaim" its status as a union in a transparent effort to evade the nonstatutory labor exemption and the Norris-LaGuardia Act. That scheme will unfold in four steps: The Union will (a) purport to disclaim its status as the Players' exclusive bargaining representative; (b) have certain Players initiate a baseless antitrust action—directed, coordinated, and funded by the Union and litigated by the Union's outside counsel—against MLB, claiming that its disclaimer deprives MLB of antitrust protection under the nonstatutory labor exemption; (c) continue, through its executives and counsel, to pursue a new CBA under the guise of resolving that litigation; and (d) if it can secure a favorable outcome, reconstitute the same executives and counsel as a reborn union to represent the same Players.

52. The Union and Players are operating under the direction of Meyer and a team of outside lawyers—including Meyer's former colleague Jeffrey Kessler[54]—who have deployed the same disclaimer tactic against three other major North American professional sports leagues. Meyer has represented the players' unions for the NFL, the NBA, and the NHL when each of those unions abandoned—or threatened to abandon—negotiations to disrupt normal collective

---

[54] Evan Drellich, *MLBPA Conducts financial review, bolsters collective bargaining team*, New York Times (Dec. 12, 2024), https://www.nytimes.com/athletic/5988744/2024/12/12/players-union-finances-tony-clark/.

bargaining procedures with antitrust lawsuits. Their previous use of these tactics provides the key to understanding the nature and significance of the Union's current anticipated course of action.

53. The mentor of Meyer and Kessler, longtime player-association counsel James Quinn, claims to have first conceived of the disclaim-and-sue scheme in 1988 as a way for players to become "fully armed and dangerous" during a labor dispute against the NBA. In a chapter of his memoir entitled "Let's Blow Up the Union," Quinn concedes the strategy is a sham: "Look, under my theory, the Players Association wouldn't disappear[,] . . . [w]e would become a professional trade association."[55] Through the maneuver, Quinn believed he could leverage the benefits of a union while denying the league any of the reciprocal protections that come with union status. "By remaining a trade association, we could keep the organization intact as we continued the antitrust court fight and fund it through [the Union's] trading card and other licensing revenue."[56] The tactic sought to elevate form over substance: "If there's no labor union, how could there be a labor defense?"[57] Thus, in 1988, the National Basketball Players Association ("NBPA") threatened the NBA with disclaimer in an attempt to gain a bargaining advantage but did not formally disband the union.

54. Quinn, Meyer, and Kessler first executed their strategy of purported disclaimer in 1989 followed by antitrust litigation in 1990, when they represented the National Football League Players Association (the "NFLPA") and NFL players. Under the direction of their lawyers, the NFLPA purportedly disclaimed interest in collective bargaining, then directed and financed antitrust lawsuits against the NFL. The players contended that their antitrust claims were viable because the union's unilateral disclaimer eliminated the NFL's nonstatutory labor exemption. To argue that the union's disclaimer was not a sham designed to secure a strategic

---

[55] Jim Quinn, *Don't Be Afraid to Win*, 152 (2019).

[56] *Id.* at 152–53.

[57] Quinn's legal team was not unanimous in supporting the threatened tactic. The NBA Players Union's "labor guru" George Cohen was purportedly "appalled" by Quinn's suggestion. *Id.* at 152–53.

(and unlawful) litigation advantage, Kessler swore under oath that "the NFLPA's abandonment of collective bargaining rights was *permanent and irreversible*, and not designed to put pressure on the NFL to achieve a new collective bargaining agreement." ECF 99, Aff. of Jeffrey L. Kessler at 2, *McNeil v. Nat'l Football League*, No. 4:90-cv-00476-DSD-FEB (D. Minn. Nov. 2, 1990) (emphasis in original). Kessler's statements were proven false when the NFLPA later reversed its supposed disclaimer and resurrected itself as a union immediately upon negotiating a new collective bargaining agreement. Meyer has referred publicly to that litigation, and its subsequent settlement, as "the most rewarding litigation victory" in his career.[58]

55. In 2011, the NFLPA again disclaimed. Meyer and his colleagues repeated the same tactic, insisting in *Brady v. Nat'l Football League*, 779 F. Supp. 2d 992, 998 (D. Minn.), *vacated*, 644 F.3d 661 (8th Cir. 2011), that the NFLPA was (once again) permanently disclaiming its union status, only to (once again) retract that disclaimer as soon as the league and the union reached a collective bargaining agreement. Just as they had decades before, Meyer and his colleagues brought antitrust litigation immediately after orchestrating the purported disclaimer of the NFLPA. In their suit, they argued that the NFL's lockout of its players constituted a group boycott in violation of federal antitrust laws. Once again, they argued that their antitrust suit should succeed because their disclaimer immediately ended the bargaining relationship that supported application of the nonstatutory labor exemption. While the district court enjoined the NFL's lockout, the Eighth Circuit stayed the injunction pending appeal, finding that it had "serious doubts that the district court had jurisdiction to enjoin the League's lockout, and accordingly concluded that the League has made a strong showing that it is likely to succeed on the merits." *Brady v. Nat'l Football League*, 640 F.3d 785, 792 (8th Cir. 2011).

---

[58] Mike Mazzeo, *What to know about MLBPA interim executive director Bruce Meyer,* Sports Business Journal (Feb. 18, 2026), https://www.sportsbusinessjournal.com/Articles/2026/02/18/mlbpa-deputy-exec-director-bruce-meyer-an-overview/.

56. Soon after, the Eighth Circuit reversed and vacated the injunction. The court held that "[section] 4(a) of the Norris–LaGuardia Act deprives a federal court of power to issue an injunction prohibiting a party to a labor dispute from implementing a lockout of its employees." *Brady*, 644 F.3d at 680–81. In reaching this conclusion, the court noted that the Norris-LaGuardia Act's definition of "labor dispute" was "extremely broad" and did not require "the present existence of a union[.]" *Id.* at 671–73. The court emphasized that the players' lawsuit was "a controversy concerning terms or conditions of employment" as the players sought "broad relief that would affect the terms or conditions of employment for the entire industry of professional football." *Id.* at 670. Further, the court observed that because the NFL and NFLPA had been engaged in collective bargaining over terms of employment up until the day the union disclaimed its status and the players filed their antitrust action, "the labor dispute did not suddenly disappear just because the [p]layers elected to pursue the dispute through antitrust litigation rather than collective bargaining." *Id.* at 673. After losing the jurisdictional issue before the Eighth Circuit, the NFLPA settled its antitrust litigation against the NFL as part of negotiating a new collective bargaining agreement—and the NFLPA quickly reconstituted itself (as it had done before) as a labor organization.

57. Similar legal teams pursued materially identical tactics against other professional sports leagues—in 2011, against the NBA, and in 2012, against the NHL.

58. In the NBA dispute, the league instituted a lockout following expiration of the collective bargaining agreement. As the NBA and NBPA negotiated a new agreement, the NBPA threatened to disclaim its representational status unless its bargaining demands were met, while simultaneously preparing antitrust litigation designed to enjoin the league's conduct. In response to the NBPA's threats of disclaimer and antitrust challenge, the NBA filed a declaratory judgment action in the Southern District of New York seeking a determination that its lockout was lawful under the antitrust laws notwithstanding any such disclaimer. ECF 1, Complaint, *Nat'l Basketball Ass'n v. Nat'l Basketball Players Ass'n*, No. 1:11-cv-05369-PGG (S.D.N.Y. Aug. 2, 2011). The NBPA's counsel moved to dismiss, arguing that any suggestion of imminent

disclaimer or litigation was unfounded. Again, however, those representations quickly proved false. Less than two weeks after oral argument on the motion to dismiss, and before any ruling on it, the NBPA—contrary to its prior representations—disclaimed its status as the players' collective bargaining representative on November 14, 2011. And within twenty-four hours of the disclaimer, players represented by the NBPA's same counsel filed coordinated antitrust lawsuits seeking to enjoin the NBA's lockout. As in the NFL cases, the NBPA's disclaimer was neither permanent nor genuine. The parties reached agreement on new terms and conditions of employment less than two weeks later, with the NBPA immediately reconstituting itself as a labor organization and resuming its role as the players' collective bargaining representative.

59. The same pattern was evident in the NHL labor dispute the following year. Advised by Meyer, the NHL Players' Association ("NHLPA") openly prepared to deploy the same playbook—a purported disclaimer followed by antitrust litigation challenging the league's lockout. In late November 2012, it became known that the NHLPA—like the NBPA and NFLPA before it—planned to pursue the disclaimer tactic and file an antitrust lawsuit attacking the legality of the lockout. As one player publicly explained, "After watching the other sports leagues go through labor disputes last year, it is apparent that until decertification is filed, there will not be any real movement or negotiation. Many things in our negotiation are very consistent with the NFL and NBA negotiations, and both of those leagues filed papers necessary to decertify . . . . Decertification becomes part of the script . . . [and] is a push back and should show we want a negotiation and a fair deal on at least some of our terms." ECF 1, Complaint ¶ 53(a), *Nat'l Hockey League v. Nat'l Hockey League Players' Ass'n*, No. 1:12-cv-09133-PAE (S.D.N.Y. Dec. 14, 2012). NHL players eventually voted to authorize the union's executive board to disclaim interest in representing the players in December 2012. Far from reflecting any genuine breakdown in negotiations or inability on the NHLPA's part to represent its members, the NHLPA continued to function as the players' bargaining agent throughout this period, even as it threatened to abandon that role for litigation purposes. Just a few weeks later—

prior to the NHLPA formally disclaiming or filing for decertification—the parties reached a negotiated agreement on a new collective bargaining agreement, ending the lockout.

60. MLB anticipates that Meyer and the MLBPA will now deploy the same playbook against MLB: The Union will purport to disclaim its representational status, and the Players—coordinated by the Union's outside counsel and funded by the Union and its related commercial and charitable entities—will promptly file an antitrust lawsuit seeking injunctive relief to stop MLB from implementing a Lockout. The Players' lawsuit will be premised on the notion that, because the MLBPA disclaimed its status as a labor organization, their fight with MLB is no longer a labor dispute, and so MLB's nonstatutory labor exemption evaporates overnight and Norris-LaGuardia's prohibition on injunctions in labor disputes no longer applies. But as with the NFL, NBA, and NHL, the sole purpose behind the Union's purported "disclaimer" is to attempt to secure an unlawful bargaining advantage by pursuing new collective terms and conditions of Player employment through an antitrust lawsuit and the threat of treble damages rather than through collective bargaining.

61. The Union has already made clear that it believes a sham disclaimer is a viable approach. Last year, the Union filed an amicus brief to the United States Supreme Court emphasizing that baseball players should "have antitrust recourse for restraints in the labor market in the event they choose at some point no longer to be represented by a union."[59] Discussing Minor League players, the MLBPA took the (incorrect) position that if the players "were to choose for whatever reason in the future to cease being represented by a union, . . . Major League Baseball would lose its nonstatutory labor exemption."[60]

---

[59] Brief of the MLBPA as *Amicus Curiae* in Support of Petitioners, *Cangrejeros de Santurce Baseball Club, LLC v. Liga de Béisbol Profesional de Puerto Rico, Inc.*, No. 25-416, 2–3 (Nov. 6, 2025), available here: https://www.supremecourt.gov/DocketPDF/25/25-416/383760/20251106145004089_25-416acMajorLeagueBaseballPlayersAssociation.pdf.

[60] *Id.* at 15.

62. The Union, notwithstanding its purported intention to permanently abandon its role as the Players' collective bargaining representative, will continue to act as a labor organization. Indeed, the Union will continue to appoint trustees to the MLB Players Benefit Plan and administer the Plan. It will continue to operate MLB Players, Inc., administering Players' group name, image, and likeness rights. These actions, among others, all confirm that the MLBPA will remain a functioning labor organization regardless of any purported disclaimer.

63. As such, the Union's anticipated disclaimer will not be a genuine, permanent, and unequivocal renunciation of its representative status. Rather, it will be a sham with the sole purpose of providing Defendants a pretext to claim (falsely) that the collective bargaining relationship has terminated, and that there is no longer any bar to using antitrust claims and the threat of treble damages and injunctions to try to get their way at the bargaining table.

64. The Union's obstruction has already disrupted the collective bargaining process, creating substantial uncertainty and impeding MLB's good-faith and legitimate efforts to negotiate a new CBA. The Union has been emboldened because it believes that, if it does not reach a deal before the CBA expires, it can resort to its disclaim-and-sue scheme to exert pressure on MLB that would not be possible using lawful labor tactics. Now that the CBA is expiring and a Lockout is imminent, the Union will ratchet up its pressure campaign by acting on its scheme. The dispute has escalated to the point where judicial intervention to affirm the permissibility of the Lockout and the unavailability of an injunction is necessary and justified.

### E. MLB Intends to File an Unfair Labor Practice Charge With the NLRB Based on the Union's Refusal to Bargain in Good Faith.

65. In light of the Union's refusal to bargain in good faith, as well as the disruptive effect its disclaim-and-sue gamesmanship will continue to have on labor negotiations between the parties, MLB will imminently file an unfair labor practice charge with the NLRB. Section 8(d) of the NLRA defines the duty to bargain as the mutual obligation to "confer in good faith with respect to wages, hours, and other terms and conditions of employment," 29 U.S.C. § 158(d), and Section 8(b)(3) makes a union's refusal to do so an unfair labor practice, as here.

66. MLB intends to request that the NLRB determine, in the exercise of its primary jurisdiction over such issues, that the Union's refusal to bargain in good faith over MLB's core economic proposals violates Section 8(b)(3) of the NLRA. The Union's categorical refusal to negotiate over MLB's salary cap and floor proposal—a pre-ordained stance it announced before bargaining began and has maintained ever since—is not hard bargaining; it is an unlawful refusal to bargain without a genuine intention of reaching agreement. Moreover, running out the clock and using the disclaim-and-sue scheme as a tactical maneuver is inherently destructive of the bargaining process, and does not reflect a clear, unequivocal, and good-faith renunciation of representative status.

67. As the Supreme Court has emphasized, "[t]he labor laws give the Board, not antitrust courts, primary responsibility for policing the collective-bargaining process." *Brown*, 518 U.S. at 242. Under the NLRA, the NLRB has primary jurisdiction over matters unique to labor-management relations, including the resolution of unfair labor practices, determination of questions concerning employee representation and bargaining unit definition, and activity subject to Sections 7, 8, and 9 of the NLRA. It is well-established that federal courts should defer to the NLRB on representational issues because they fall squarely within the special competence and expertise of the NLRB. Representational issues include questions concerning the existence, scope, and continuation of a union's status as the exclusive bargaining representative.

68. The determination of whether a union has engaged in good-faith bargaining and then later validly disclaimed interest—or instead has engaged in bad-faith bargaining and a sham disclaimer done purely for tactical purposes within the bargaining process—constitutes a paradigmatic representation issue. Courts lack jurisdiction to make initial decisions regarding the validity of a disclaimer and the Union's representative status and instead must defer to the NLRB's expertise in adjudicating these issues to ensure uniformity and to avoid inconsistent determinations concerning representational status. To the extent the validity of the disclaimer is relevant to the parties' dispute, that will be a matter for the NLRB to decide.

## V. CLASS ACTION ALLEGATIONS

69. This action is brought, in part, against a defendant class pursuant to Rules 23(a), (b)(1)(A), (b)(1)(B), and/or (b)(2) of the Federal Rules of Civil Procedure. The class consists of all persons who, at any time during the period commencing upon the expiration of the 2022–2026 CBA at 11:59 p.m. ET on December 1, 2026, and ending on the date of a final and unappealable judgment in this action, (i) are under a Major League Uniform Player's Contract with an MLB Club, but excluding outright players who remain assigned to a Club's Minor League system, or (ii) are Major League free agents. The individual defendants described in paragraph 16 are the class representatives.

70. The class is so numerous and geographically widespread that joinder of all members is impracticable. At a minimum, the class consists of more than 1,500 Players.

71. There are questions of law and fact common to the class, including (a) whether the Lockout is lawful and protected from antitrust challenge by the nonstatutory labor exemption; (b) whether the Lockout is lawful under the antitrust laws because it is not an unreasonable restraint on trade; and (c) whether the federal courts lack jurisdiction to enjoin or restrain MLB's Lockout under the Norris-LaGuardia Act and Section 20 of the Clayton Act.

72. The claims or defenses of the class representatives will be typical of the claims or defenses of the class. These claims or defenses include the assertions that (a) the Lockout is not shielded from antitrust challenge because the Union's purported disclaimer terminates the nonstatutory labor exemption; (b) MLB's exercise of its federal labor-law right to lock out Players is a violation of the antitrust laws; and (c) the federal courts do not lack jurisdiction to enjoin or restrain the Lockout.

73. The representative defendants and their counsel will fairly and adequately represent the interests of the class they represent.

74. Each Player in the class will be subject to the Lockout.

75. The prosecution of separate actions by or against individual members of the class would create the risk of (a) inconsistent or varying adjudications with respect to individual class

members that would establish incompatible standards of conduct for MLB; and (b) adjudications with respect to individual class members that would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede the ability of such absent class members to protect their interests. Declaratory relief with respect to the common questions of law and fact identified above is therefore appropriate with respect to the class as a whole.

76. In addition, by locking out Players, MLB will act or refuse to act on grounds generally applicable to the class, making declaratory relief appropriate with respect to the entire class.

## VI. CLAIMS FOR RELIEF

### COUNT ONE—Declaratory Judgment

**(The Lockout Does Not Violate the Antitrust Laws under the Nonstatutory Labor Exemption)**

77. The foregoing paragraphs are hereby incorporated as though fully set forth herein.

78. Plaintiffs seek a judicial determination and declaration of their rights and obligations, specifically, that MLB's decision to lock out its Players upon the expiration of the current CBA on December 1, 2026, does not violate the antitrust laws.

79. The Lockout will be imposed by MLB during, and as an integral part of, the collective bargaining process and as a lawful exercise of MLB's federal labor law rights. The nonstatutory labor exemption to the antitrust laws protects with equal force the right of employers to lock out employees and employees' corresponding right to strike.

80. A disclaimer by the Union of its status as a bargaining representative for the Players would not change the application of the nonstatutory labor exemption. Even if that anticipated disclaimer were not a sham (it plainly will be), the nonstatutory labor exemption would continue to apply, because the Lockout will not be "sufficiently distant in time and in circumstances from the collective-bargaining process" to expose it to antitrust scrutiny. *Brown,* 518 U.S. at 250.

81. Moreover, notwithstanding any purported disclaimer, the Union is and will continue to be a "labor organization" within the meaning of the NLRA, 29 U.S.C. § 152(5), with the purpose of dealing on a concerted basis with MLB with respect to the collective terms and conditions of employment of Players. The definition of "labor organization" is very broad; it encompasses "any organization of any kind . . . in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152(5). The collective bargaining relationship between MLB and the Union remains, and will continue to remain, intact even if the MLBPA purports to disclaim.

82. Finally, the validity of the Union's disclaimer in these circumstances would be a question committed to the primary jurisdiction of the NLRB, not the federal courts. The doctrine of primary jurisdiction would require the NLRB to determine, in the first instance, whether the Union's purported disclaimer validly terminated its status as the Players' collective bargaining representative or was instead a continuation of its failure to bargain in good faith in violation of Section 8(b)(3) of the NLRA. And the nonstatutory labor exemption would continue to apply at least "until final resolution of Board proceedings and appeals therefrom[.]" *Powell v. Nat'l Football League*, 930 F.2d 1293, 1303–04 (8th Cir. 1989). The Union and Players thus have no path to judicial interference with the Lockout that does not require exhausting proceedings before the NLRB under the labor laws.

83. Defendants dispute MLB's contentions set forth in paragraphs 77 through 82. There thus exists a substantial, present, and justiciable controversy between MLB and Defendants as to the legality of the Lockout, and the ability of Defendants to challenge it, under the antitrust laws.

84. By reason of the foregoing, MLB is entitled to a declaration that the Lockout is lawful because it is protected from antitrust challenge by the nonstatutory labor exemption.

**COUNT TWO—Declaratory Judgment**

**(The Lockout Does Not Violate the Antitrust Laws under the Rule of Reason)**

85. The foregoing paragraphs are hereby incorporated as though fully set forth herein.

86. In the alternative to relief under Count One, Plaintiffs seek a judicial determination and declaration of their rights and obligations, specifically, that an MLB Lockout of Players after expiration of the current CBA in furtherance of the League's competitive balance does not constitute an unreasonable restraint of trade under the antitrust laws.

87. Even if the nonstatutory labor exemption did not preclude an antitrust challenge, the Lockout would be lawful under the antitrust laws because it does not constitute an unreasonable restraint of trade. The Lockout is a temporary bargaining measure, designed to secure a new CBA, which is ancillary to the legitimate purposes of MLB's joint venture, and has procompetitive justifications that outweigh any alleged anticompetitive effects.

88. Defendants dispute MLB's contentions set forth in paragraphs 85 through 87. There thus exists a substantial, present, and justiciable controversy between MLB and Defendants as to the legality of the Lockout under the antitrust laws.

89. By reason of the foregoing, MLB is entitled to a declaration that its Lockout in support of its lawful bargaining demands is not an unreasonable restraint of trade.

**COUNT THREE—Declaratory Judgment**

**(The Norris-LaGuardia and Clayton Acts Prohibit an Injunction Against the Lockout)**

90. The foregoing paragraphs are hereby incorporated as though fully set forth herein.

91. Plaintiffs seek a judicial determination and declaration of their rights and obligations, specifically, pursuant to the Norris-LaGuardia Act and Section 20 of the Clayton Act, that the federal courts lack jurisdiction to enjoin or restrain MLB from locking out Players.

92. MLB's anticipated Lockout involves and grows out of its labor dispute with Players over the collective terms and conditions of their employment. MLB and the Players, including the named Player Defendants, are engaged in the same industry (professional baseball),

and the dispute is between one or more employers or associations of employers (MLB and the Clubs) and one or more employees (the Players).

93. By implementing the Lockout, MLB will be, among other things, ceasing and refusing to remain in a relation of employment with Players and withholding from Players, and persons seeking to become Players, money and/or things of value. Accordingly, the federal courts are deprived of jurisdiction to enjoin or restrain the Lockout by Sections 1, 4, and 7 of the Norris-LaGuardia Act as well as by Section 20 of the Clayton Act.

94. The Union's anticipated disclaimer of its status as a bargaining representative for the Players would not change the operation of the Norris-LaGuardia Act. The Act applies to all labor disputes, not just those involving a union, so it would continue to apply regardless of whether the disclaimer was a sham.

95. MLB anticipates that Defendants will invoke the antitrust laws to seek an injunction against the Lockout. Defendants dispute MLB's contentions set forth in paragraphs 90 through 94. There thus exists a substantial, present, and justiciable controversy between MLB and Defendants as to whether the federal courts lack the jurisdiction to enjoin or restrain the Lockout.

96. By reason of the foregoing, MLB is entitled to a declaration that the federal courts lack jurisdiction to enjoin or restrain the Lockout under the Norris-LaGuardia Act as well as under Section 20 of the Clayton Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief against Defendants:

a) On the first count, judgment declaring that MLB may lock out Players without violating the antitrust laws pursuant to the nonstatutory labor exemption;

b) On the second count, judgment declaring that MLB's Lockout does not constitute an unreasonable restraint of trade under the antitrust laws;

c) On the third count, judgment declaring that, pursuant to the Norris-LaGuardia Act and the Clayton Act, the federal courts lack jurisdiction to enjoin or restrain MLB from locking out Players;

d) An order determining that the claims alleged herein may be maintained as a defendant class action under Federal Rule of Civil Procedure 23(a), (b)(1)(A), (b)(1)(B), and/or (b)(2) and certifying the class as defined above; and

e) Such other and further relief as the Court shall deem proper.

Respectfully submitted,

KEKER, VAN NEST & PETERS LLP

Dated: November 25, 2026

By: */s/ R. Adam Lauridsen**

R. ADAM LAURIDSEN (**pro hac vice* forthcoming)
NICHOLAS S. GOLDBERG (*pro hac vice* forthcoming)
THOMAS E. GORMAN (*pro hac vice* forthcoming)
CHRISTINE M. ZALESKI (*pro hac vice* forthcoming)
633 Battery Street
San Francisco, CA 94111-1809
Telephone: 415 391 5400
Facsimile: 415 397 7188
alauridsen@keker.com
ngoldberg@keker.com
tgorman@keker.com
czaleski@keker.com

NEIL H. ABRAMSON
ADAM M. LUPION
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
nabramson@proskauer.com
alupion@proskauer.com

PAUL D. CLEMENT (*pro hac vice* forthcoming)
ERIN E. MURPHY (*pro hac vice* forthcoming)
JAMES Y. XI (*pro hac vice* forthcoming)
BENNETT R. STEHR (*pro hac vice* forthcoming)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-6900
paul.clement@clementmurphy.com
erin.murphy@clementmurphy.com
james.xi@clementmurphy.com
bennett.stehr@clementmurphy.com

Attorneys for Plaintiffs